T.C. Memo. 2019-20

UNITED STATES TAX COURT

EDWARD G. KURDZIEL, JR., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21186-12, 12674-13.          Filed March 21, 2019.

Robert J. Gumser, for petitioner.

Michael S. Hensley, Erin Kathleen Salel, and Jeffrey L. Heinkel, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Edward G. Kurdziel is the only man in America licensed

to fly a Fairey Firefly.  He is also the only man in America who has a Firefly to fly.

But restoring this old WWII fighter and submarine hunter took bales of money,

[*2] which he's never gotten back. Kurdziel says the restoration was a business and claimed big deductions for it on his returns for 2007 through 2010. The Commissioner says it was all just a very expensive hobby.

FINDINGS OF FACT

Edward Kurdziel, also known as Captain Eddie, is a highly skilled mechanical engineer and an experienced pilot. He finished high school when he was just 16 years old and went to Marquette University as "the first kid ever accepted * * * after two years of high school." Kurdziel's higher education--paid for in full by the United States Navy--didn't end with his undergraduate degree. At 19 he landed in graduate school for engineering, and all the while worked as a private pilot on the side.

School flew by, and Kurdziel was only 21 when he received a commission in the Navy. There he spent 25 years as a fighter pilot, 8½ of which were on active duty. After he was honorably discharged, he started flying 747s for Northwest and then Delta Airlines, where he remains a captain. In total he has 45 years of flying experience under his wings.

**[*3]** I.      <u>The Fairey Firefly</u>

     A.      <u>Background and Purchase</u>

In 1994, not long after beginning his commercial airline career, Kurdziel bought a two-seat fighter aircraft known as the Fairey Firefly WB518/N518WB. American warplanes of 75 years ago had some great names--Hellcats, Avengers, Flying Fortresses, Demons, and Thunderbolts. Our British allies also had some fine names for their aircraft--Hurricanes and Spitfires, Tempests and Typhoons. And then there were the warbirds made by Fairey Aviation, which included the Albacore and Barracuda, the Spearfish and the Seafox--and the plane at the center of these cases, the Fairey Firefly. The Firefly entered service as a carrier-based fighter for the Royal Navy toward the end of the war, and became a specialist in antishipping and antisubmarine warfare. <u>See</u> John Rickard, <u>Fairey Firefly - Development and Combat</u>, Military History Encyclopedia on the Web (Jan. 31, 2009), http://www.historyofwar.org/articles/weapons_fairey_firefly.html. Its late birth meant there were far fewer built than the more famous Hurricanes and Spitfires. <u>See</u> <u>id.</u> According to Kurdziel, the Firefly "first flew in '41" and "was the first British airplane to fly over Japan and Tokyo in 1945 during the [occupation] of Japan." Later models of the Firefly operated well into the 1960s.

**[\*4]** Kurdziel first spotted a Firefly in 1974 when it was featured on the cover of a flying magazine. Nearly 20 years later, in the fall of 1993, he learned that a Firefly was for sale in Australia. He had to have it. "I bought it sight unseen basically * * * I thought it was a great airplane" and "[n]obody knew what it was in the United States." He made a couple trips to see the Firefly in person and then consulted with some mechanics. The Firefly he wanted had not flown for years, possibly decades. But Kurdziel bought it for around $200,000, which he financed by borrowing against his house for what he could not pay from his own liquid funds. Shipping cost him an additional $60,000 as the airplane had to be shipped from Australia. This was certainly no small investment.

Around the same time that Kurdziel bought the Firefly, he also took "early, early looks at trying to do something with the airplane." His first plan was to sell rides on the plane. He estimated the cash that this would bring in. He talked with mechanics to reckon the cost of restoration and maintenance, and called "insurance companies to figure out insurance if [he was] going to have people flying it * * * for charter or training." He also collaborated with members of the Royal Australian Navy on a plan to restore the airplane, as both parties wanted to see the Firefly flying again.

[*5]   The Firefly was 60% restored when Kurdziel bought it, but it still required a large investment of time and money to become airworthy.  It took "[e]ight years and 45,000 man hours" to fully restore the plane, and as many as 10 full-time workers.  Beyond paying these workers, Kurdziel devoted thousands of hours to the project himself, driving to the restoration worksite in Colorado and back twice a month.  According to him, the restoration and maintenance of the Firefly was "a full-time job" and "takes everything you have."  As is true of almost all old planes, there were no working spare parts available on the aftermarket.  This meant Kurdziel had to design many of the Firefly's replacement parts himself.  "I did all the instruments, did the oxygen system.  I mean, the mechanics were basically my hands.  It's my design."

This was a remarkable amount and quality of work--very few planes of that age ever get back into the sky.  But Kurdziel's Firefly took off in 2002 after it got an "air worthiness certificate" from the Federal Aviation Administration (FAA).  For a pilot with today's training to learn how to fly such a venerable plane is also a remarkable achievement, and Kurdziel got the FAA to license him to fly it.  To this day, he is the only person with such a license.  The Firefly soon began winning prizes; it earned the title of grand champion in the country's premier air show in Oshkosh, Wisconsin, and won another at the National Aviation Heritage

[*6] Invitational in Reno, Nevada. The Firefly's fame took off, and it landed on 20 or 30 different magazine covers. See, e.g., John Sotham, The Champ: From the Decks of World War II Aircraft Carriers to Today's Airshow Circuit-the Journey of a Royal Australian Navy Fairey Firefly, Air & Space Magazine (July 2003), https://www.airspacemag.com/military-aviation/the-champ-4810438/.

B.    "Airplane Leasing" Activity

Making money with the Firefly was more difficult. Kurdziel initially formed Firefly, LLC, to own and operate the airplane. But in 2003, he brought it to California and transferred its ownership to a trust to achieve more favorable state-tax treatment. Kurdziel wanted to earn some money by flying the plane at military air shows, which required him to learn how to become a government contractor. He did, and in 2004 met the requirements to contract with the federal government. These stirrings of business activity led Kurdziel to report his Firefly income and expenses on the Schedule C, Profit or Loss From Business, of his 2005 tax return. But for both that and later tax years, Kurdziel reported that his Firefly activity was in the business of "Airplane Leasing." This was not true-- Kurdziel has never leased out the Firefly. But reporting his Firefly activity as a business brought with it some big tax advantages. The great gobs of money that the restoration had required led Kurdziel to claim an adjusted basis in the Firefly

**[*7]** of just over $1.6 million on his 2005 return, which generated a nearly $82,000 depreciation deduction for that year alone. In total Kurdziel reported $129,230 in total expenses related to the Firefly, and $115,280 in business loss--an amount which reduced Kurdziel's taxable income from other sources by more than half. Similar Schedules C were produced in subsequent tax years on which Kurdziel claimed over $80,000 in depreciation deductions and six-figure net losses that greatly offset his income.

The Firefly continued its airshow appearances and brought in some income in most years, but this income never came close to covering even Kurdziel's out-of-pocket costs. And remember Kurdziel's initial plan to earn money by selling rides? Well, he soon learned that this was a legal impossibility due to FAA regulations, and it remained legally impossible for all the years at issue in these cases. Kurdziel would, however, still give free rides as they "are invaluable for press * * * [and] the exposure[]."

Kurdziel's losses associated with the Firefly increased with each year at issue. Here's a table:

| [*8] | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Depreciation | $82,802 | $83,903 | $85,077 | $86,250 |
| Insurance | 11,976 | 16,300 | 16,300 | 16,300 |
| Legal and professional services | 250 | 500 | 2,958 | 600 |
| Office expense | 30 | 168 | -0- | -0- |
| Rent | 10,800 | 10,800 | 11,493 | 12,526 |
| Repairs and maintenance | 5,534 | 540 | 1,322 | 1,191 |
| Supplies | -0- | -0- | 97 | 15 |
| Taxes and licenses | 200 | 125 | -0- | -0- |
| Travel, meals, and entertainment | 1,917 | 1,242 | 2,766 | 1,292 |
| Other expenses[1] | 13,317 | 19,687 | 16,020 | 11,480 |
| Total expenses | 126,826 | 133,265 | 136,033 | 129,654 |
| Income | 9,685 | 14,400 | 14,000 | -0- |
| Net loss | (117,141) | (118,865) | (122,033) | (129,654) |

And here's another to show how Kurdziel's Schedules C net losses reduced his income from other sources:

---

[1] "Other expenses" listed on Kurdziel's Schedules C include (1) annual inspection, (2) dues and subscriptions, (3) airplane fuel and oil, (4) website, (5) parachute packing, (6) support equipment, (7) postage delivery, and (8) education.

| [*9] | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Income from other sources | $272,832 | $159,738 | $176,074 | $187,015 |
| Schedule C net losses | (117,141) | (118,865) | (122,033) | (129,654) |
| Other losses: | | | | |
| Rental and other business losses | (87,457) | (102,156) | (61,635) | (39,379) |
| Net operating loss | (77,617) | (77,617) | (77,617) | (116,070) |
| Total income | (9,383) | (138,900) | (85,211) | (98,088) |

During all years at issue Kurdziel neither had a formal business plan for the Firefly nor kept books and records or separate bank accounts for his Firefly-related activities. He flew the Firefly in airshows until 2012, when a part failed and it crashed while landing. Kurdziel continues to work on its repair.

C.     Airworld LLC, Etc.

One unusual aspect of these cases is that the Firefly is not Kurdziel's only putative side business. In 2006 he formed a flight-training business named Airworld LLC. He did not transfer the Firefly to this LLC, but in a way the old plane was the catalyst of this new business, since the Firefly had become so popular and "people ha[d] asked [him] to do flight training." Kurdziel reported Airworld's operations on Schedules E, Supplemental Income and Loss, of his

[*10] 2007 through 2009 income tax returns, and the Commissioner allowed all the losses that he claimed.

Kurdziel also had other airplane-based ventures--the Airborne Tactical Advantage Corporation (ATAC) and Strike University, an offshoot of Airworld. Although it is no longer affiliated, he started ATAC around 1994 with three others to provide tactical airborne training. "For the last 20 years, Airborne Tactical Advantage Company * * * has trained Navy, Marine, Air Force and Army air-crews, ship-crews, and Combat Controllers." ATAC, The Company, http://atacusa.com/atac_company.html (last visited Feb. 7, 2019). Strike University is "a concept * * * it's going to be a leadership school" with "very broad applications to any kind of high-risk industry--medicine, airlines, oil and gas, [and] mining." Neither it nor ATAC produced any of the items that remain in dispute in either of these cases.

II.    Audit, Petition, and Trial

Schedules C with big losses and little income rarely fly under the IRS's radar. Kurdziel received a notice of deficiency for tax years 2007 through 2009, in which the Commissioner disallowed his Schedules C and net operating loss (NOL)

**[*11]** deductions and determined 20% section 6662(a)[2] penalties on the alternate grounds of negligence or disregard of rules or regulations, substantial understatement of income tax, and substantial valuation misstatement. Following close behind was a second notice for Kurdziel's 2010 tax year, in which the Commissioner disallowed the same deductions, plus a few deductions on Schedule A, Itemized Deductions, and a loss on Kurdziel's Schedule E, and bolted on another section 6662(a) penalty. Kurdziel timely petitioned our Court. In his petition he claimed that "the Commissioner erred in determining that the petitioner's Schedule C business * * * was not engaged in for profit" and in determining that he was not entitled to NOL deductions.

We tried these cases in San Diego.[3] At trial Kurdziel testified that he bought the Firefly as an investment and intends to eventually sell it for a profit. He testified that the airplane is "basically [his] retirement" since he lost his pension when Northwest declared bankruptcy. The Commissioner thinks this argument won't fly because Kurdziel never actually intended to sell the plane; and

---

[2] All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[3] Kurdziel lived in California at all relevant times, which means these cases are appealable to the Ninth Circuit. See sec. 7482(b)(1)(A).

[*12] even if he had, the 2012 crash significantly reduced its value, making any capital gain unlikely.

Simon Brown, a seller of World War II aircraft, testified as an expert witness that Kurdziel's Firefly is worth between $3.5 and $5 million based in part on his "visual inspection" of the airplane and the fact that he sold a different (and unrestored) Firefly for about $400,000. He also credibly testified that using replacement parts to repair a damaged plane would not decrease its value, but failing to keep it in good flying condition would. Ronald Tinkham, another experienced appraiser of vintage military aircraft, also testified as an expert witness that Kurdziel's Firefly could reasonably sell for over $8 million. Tinkham, however, stressed that this was an estimate and not an official appraisal.

Although the Commissioner determined a section 6662(a) penalty for each year at issue, at trial he failed to introduce any evidence that he'd complied with section 6751(b). See Graev v. Commissioner (Graev III), 149 T.C. 485, 493 n.14 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

**[\*13]**                                      OPINION

After concessions, we are left to answer:

- did Kurdziel have a profit motive in his use of the Firefly during the 2007-10 tax years;

- did Kurdziel substantiate his claimed Schedule C "annual inspection" expenses in excess of $6,488, and any of his contested Schedule A itemized deductions for the 2010 tax year;

- did Kurdziel establish that he is entitled to NOL deductions for the 2007-10 tax years; and

- is Kurdziel liable for accuracy-related penalties for tax years 2007-10?

We answer each question below.

I.      Profit Motive

Section 162(a) permits deductions for "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business."  And section 212(1) and (2) generally allows a taxpayer to claim a deduction for all the ordinary and necessary expenses paid or incurred "for the production or collection of income," and "for the management, conservation, or maintenance of property held for the production of income."  Even if there is no trade or business, a deduction for expenses relating to investment activities may be allowable under section 212. See, e.g., Thomason v. Commissioner, T.C. Memo. 1997-480, 1997 WL 653894,

**[*14]** at *6. But section 183(a) bars taxpayers from claiming deductions for activities that are "not engaged in for profit," except as provided under section 183(b).

The test of profit motive is a subjective one--a taxpayer must show that he undertook the challenged activity with an "actual and honest objective of making a profit." See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). His expectation of a profit doesn't have to be reasonable, but it must be genuine. See sec. 1.183-2(a), Income Tax Regs. ("it may be sufficient that there is a small chance of making a large profit."); see also Elliott v. Commissioner, 90 T.C. 960, 970 (1988), aff'd without published opinion, 899 F.2d 18 (9th Cir. 1990). And a taxpayer bears the burden of proving his motive, which must be to make an economic profit and not just cut his tax bill. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212. In the Ninth Circuit, the intent to make a profit must also be the predominant, primary, or principal motive. Id.

Did Kurdziel intend to make a profit with the Firefly? The regulations give us some direction. They say to use "objective standards" to discern a taxpayer's intent, "taking into account all of the facts and circumstances." Sec. 1.183-2(a), Income Tax Regs. They give us nine factors to consider, with "[n]o one factor

**[*15]** [being] determinative." Id. para. (b). They tell us that we can look at other factors not on the list and that we should not make a determination based on the number of factors indicating a lack of profit motive and "vice versa." Id. The Seventh Circuit has called this open-ended test of objective factors of subjective intent "goofy", and has chosen not to "wad[e] through the nine factors" but instead to take a more holistic approach. Roberts v. Commissioner, 820 F.3d 247, 250, 254 (7th Cir. 2016), rev'g T.C. Memo. 2014-74.

These cases, however, are appealable to the Ninth Circuit, and so the nine-factor test it is. Here they are:

- the manner in which the taxpayer carries on the activity;

- the expertise of the taxpayer or his advisors;

- the time and effort expended by the taxpayer in carrying on the activity;

- the expectation that assets used in the activity may appreciate in value;

- the success of the taxpayer in carrying on other similar or dissimilar activities;

- the taxpayer's history of income or losses with respect to the activity;

- the amount of profits earned, if any;

- the financial status of the taxpayer; and

[*16] • any elements of personal pleasure or recreation.

Sec. 1.183-2(b), Income Tax Regs.

    A.    Manner in Which the Activity Is Conducted

The first factor has us look at how the taxpayer carries on the activity. It tells us that carrying on the activity in a "businesslike manner" and "maintain[ing] complete and accurate books and records" could indicate a profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. Kurdziel had no formal business plan for the Firefly, and maintained neither separate financial books and records nor separate bank accounts. He had a spreadsheet with the projected expenses and "cash flow" from selling airplane rides. He also had documents labeled "Firefly LLC Business Plan," "Firefly LLC Business plan for Apr 2002," and "Firefly Yearly Operating Expense Projected," which state his intent to restore the Firefly, enter it in airshows, and aid the Royal Australian Navy "in the restoration of their [sic] Firefly to flyable condition." This aid would in turn "create more awareness" of his own Firefly and "increase its marketability." We find these documents less a business plan and more a summary of Kurdziel's intent or hope. See Knowles v. Commissioner, T.C. Memo. 2017-152, at *15. We also cannot be sure when Kurdziel created these plans. There is a handwritten notation on the "Firefly LLC

**[\*17]** Business Plan" that says "Original Plan 1999-2000?," which tends to show that even its creator was unsure. The other documents do not contain dates.

We do believe Kurdziel's claim that his original plan was to sell rides on the Firefly, but after he learned this was impossible he didn't change his plans "with an intent to improve profitability." Sec. 1.183-2(b)(1), Income Tax Regs. He introduced a one-page document titled "Firefly LLC Business Plan Update" with a handwritten "2005" at the top. This update involved his plan to use the Firefly in both Airworld and Strike University, with Strike University "just start[ing]" in 2016. But Kurdziel didn't clarify how his purported 2005 update included a project that didn't start until 2016, which leads us to doubt that he drafted it back in 2005.

Against this close reading of Kurdziel's private documents are the claims he made in public filings to achieve a local property-tax exemption for the Firefly. In those filings he asserted that he was neither using the Firefly for commercial purposes nor holding it for sale. What's more, considering that Kurdziel claims that selling the Firefly has been part of his plan all along, we find it odd that he did not have an appraisal done until 2014--even though he restored the Firefly in 2002.

This factor weighs against Kurdziel.

**[*18]** B.     Expertise of Taxpayers or Advisers

This factor tells us that "[p]reparation for the activity by extensive study of its accepted business, economic and scientific practices" or consultation with experts can suggest a profit motive.  Sec. 1.183-2(b)(2), Income Tax Regs.  While "a taxpayer needn't make a formal market study in preparation for a trade or business, he's expected to undertake a basic investigation of the factors that would affect his profit."  Heinbockel v. Commissioner, T.C. Memo. 2013-125, at *24-*25 (citing Westbrook v. Commissioner, T.C. Memo. 1993-634, 1993 WL 540784, at *7, aff'd, 68 F.3d 868 (5th Cir. 1995)).

Kurdziel's proof of his expertise is his actual restoration of the Firefly to flyability.  We agree that this shows great expertise--indeed, one-of-a-kind-in-the-world expertise--in aircraft restoration, but this factor points us to expertise in making money from an activity and not just the ability to accomplish an unusually difficult objective.  We have found, however, that technical and practical experience in a specialized field can be sufficient to make this factor fall in favor of a taxpayer to some degree.  See Barker v. Commissioner, T.C. Memo. 2012-77, 2012 WL 947134, at *5 (choosing not to question taxpayer's expertise in engineering or knowledge of space exploration technology given his advanced degrees and career).  The Firefly's restoration was a huge undertaking that no ill-

**[\*19]** prepared person could pull off. What's more, Kurdziel, as both an engineer and an experienced pilot, designed many of the parts on the Firefly himself. This shows that he knew what he was doing technically. He has also been around airplanes for 45 years and seems to have had an interest in warbirds since at least 1993--which is when he testified that he first saw the Firefly.

On the other hand, we have found in a number of cases that an expert's knowledge of an activity alone is insufficient when he failed to conduct research or seek advice on its business aspects and profitability. See, e.g., Betts v. Commissioner, T.C. Memo. 2010-164, 2010 WL 2990300, at \*8. Without studying an activity's practical economics, mere technical knowledge may just reveal a skilled hobbyist and not a businessman. See Golanty v. Commissioner, 72 T.C. 411, 432 (1979), aff'd, 647 F.2d 170 (9th Cir. 1981). The fact that Kurdziel planned to sell rides in the Firefly when it has been illegal to do so throughout his ownership raises a red flag. So while Kurdziel is extremely experienced with airplanes and their restoration, we think this practical experience is canceled out by his failure to show that he did a basic investigation into the business aspects and economics of vintage airplane restoration.

This factor favors the Commissioner.

**[\*20]** C.   <u>Time and Effort Expended on the Activity</u>

"The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs.  And a taxpayer's choice to leave another job to spend most of his time on the activity may further evidence his intention to turn a profit.  See <u>id.</u>; <u>see also</u> <u>Metz v. Commissioner</u>, T.C. Memo. 2015-54, at \*46-\*47 (taxpayers' horse-breeding business was a full-time activity).  There is no doubt that Kurdziel devoted a significant amount of time to the Firefly, from restoration and maintenance to training and airshows.  He traveled to the restoration site in Colorado "twice a month for eight years" and also logged thousands of hours working on and flying the Firefly in 2007, 2008, and 2009.

But Kurdziel's work on the Firefly had "substantial personal or recreational aspects," <u>see</u> <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89, 1998 WL 88175, at \*5-\*6 , <u>aff'd without published opinion</u>, 188 F.3d 507 (6th Cir. 1999) (skilled riders put in a great deal of time to horse-breeding activity but also derived a substantial recreational benefit), even given the work associated with it, <u>see</u> <u>Giles v. Commissioner</u>, T.C. Memo. 2006-15, 2006 WL 237503, at \*13 (unpleasant tasks are often associated with a hobby).  Many of the hours that Kurdziel logged

[*21] were for personal time spent using the Firefly. He also admitted that the Firefly was a great accomplishment for him and that he gets a "tremendous amount of satisfaction" from flying it. That's not to say one can't experience satisfaction from profitable work, see Jackson v. Commissioner, 59 T.C. 312, 317 (1972), but because Kurdziel remained a full-time employee of Delta, we think the great amount of time, energy, and money that he put into the Firefly is more the result of an emotional attachment than a business, see Ballich v. Commissioner, T.C. Memo. 1978-497.

This factor is neutral.

D.      Success in Carrying On Other Similar Activities

A taxpayer's previous success in similar activities may show that he has a profit objective, even if the activity is currently unprofitable. See sec. 1.183-2(b)(5), Income Tax Regs. There's no evidence here, however, that Kurdziel was previously successful in restoring airplanes and selling them for profit. Kurdziel points to his past and subsequent real-estate investments as proof of his success in historic-airplane restoration. He says that he earned the money to buy the Firefly by buying California property and "watching the values increase." We acknowledge that both these activities involve the reasonable hope of appreciation in asset values, but don't find the link between historic-airplane restoration and

[*22] real-estate resale so simple. And Kurdziel's more recent investments are still uncertain, with only an expectation of profit. This uncertainty is in fact the only similarity to his Firefly investment, with neither yet a sure financial success.

This factor favors the Commissioner.

E.    History of Income or Loss

A series of losses during the startup stage of an activity may not necessarily indicate that an activity is not engaged in for profit. See sec. 1.183-2(b)(6), Income Tax Regs. "However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status," losses may indicate that the activity was not undertaken for profit. Id. Kurdziel reported losses from his Firefly-related activities beginning in 2005, and those losses continued through the 2007-10 tax years at issue. With each passing year his Firefly-related losses only increased, and they increased even when one considers only cash outlays. We believe these losses continued longer than they should have. Kurdziel completed the Firefly's restoration in 2002 and won his most prestigious awards that same year. If Kurdziel was interested in making a profit (and cutting his losses), he would have sold, or at least attempted a sale much sooner--especially after he learned that monetizing rides was impossible.

This factor favors the Commissioner.

**[*23]** F.    Amount of Occasional Profits, if Any

Occasional profits can show a profit motive, but the size and frequency of profits relative to losses are what matter.  See sec. 1.183-2(b)(7), Income Tax Regs.  And "[a]n occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit."  Id. Kurdziel's income from his Firefly-related activities is solely attributable to the "occasional" and "small" payments he received from his airshow appearances. These payments never exceeded even his insurance costs, and nothing in the record hints at the way the Firefly could ever become a profitable operating business.

This factor favors the Commissioner.

G.    Taxpayer's Financial Status

A taxpayer's lack of "substantial income or capital from sources other than the activity [at issue] may indicate that [the] activity is engaged in for profit."  Sec. 1.183-2(b)(8), Income Tax Regs.  Kurdziel claims that because his retirement savings suffered when Northwest merged with Delta, and because the value of the Firefly "makes him a millionaire," his Firefly activities should be seen as his main source of income.  But even assuming his retirement savings suffered, we cannot

[*24] ignore the fact that he received retirement pay from the U.S. Navy and a substantial average annual income of over $180,000 from Delta during the years at issue. Kurdziel's Firefly-related activities never produced a profit during any of the years at issue, and his losses increased each year. We find it more likely than not that Kurdziel had come to use the Firefly not as a source of income, but rather as a way to significantly reduce his taxable income from other sources. See Rowden v. Commissioner, T.C. Memo. 2009-41, 2009 WL 415601, at *7 ("Substantial income from sources other than the activity (especially if the losses from the activity generate substantial tax benefits) may indicate a lack of profit motive").

This factor weighs heavily in favor of the Commissioner.

H. Elements of Personal Pleasure or Recreation

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. Kurdziel contends that while flying and working on the Firefly is satisfying, it is a "full-time job" that "takes everything you have." But many hobbies can take a lot of time and energy while still being mostly a source of personal recreation. See Betts, 2010 WL 2990300, at *9. And we have found a for-profit activity even

**[*25]** where the taxpayer clearly enjoys what he is doing but limits his personal use of business assets. See Pryor v. Commissioner, T.C. Memo. 1991-109 (taxpayer "clearly enjoy[ed] sailing" but limited his personal use of his boat to just five days during the years at issue); see also Dickson v. Commissioner, T.C. Memo. 1983-723 (taxpayer greatly enjoyed sailing but only did so 7 to 10 times during the years at issue). Kurdziel offered evidence of his "personal hours spent" with the Firefly (both working on it and flying it) during 2007-09--1,200.5 hours in 2007, 1,041.5 hours in 2008, and 544.5 hours in 2009.

Beyond this, we agree with the Commissioner that the Firefly brought Kurdziel a good deal of fame and became closely linked to his social life. He got a tremendous amount of satisfaction from flying the Firefly, showing off its restoration, and being the only person in the country qualified to fly it.

This factor favors the Commissioner.

I.    Expectation That Assets Used in Activity May Appreciate in Value

An expectation that assets will appreciate in value can suggest a profit motive even if the taxpayer derives no profit from his current operations. See sec. 1.183-2(b)(4), Income Tax Regs. But before determining whether a taxpayer expected his assets to appreciate in value, we must first determine whether the assets in question are part of the activity at issue. See sec. 1.183-1(d)(1), Income

[*26] Tax Regs.; see also Engdahl v. Commissioner, 72 T.C. 659, 668 n.4 (1979) (holding that land and horse-related activities were a single activity for purposes of determining appreciation of assets under section 1.183-2(b)(4), Income Tax Regs.).

Neither party specifically addressed whether Kurdziel's ownership of the Firefly as an investment is separate from his airshow activities. But as far as we can tell, the airshows--if attended with a profit motive at all--were really just a way to showcase the Firefly; he didn't go to them primarily for the relatively small appearance fees. Kurdziel even testified that his goal in attending these shows was to increase the Firefly's value. It seems to us that Kurdziel's only reasonable chance of making a profit was to hold the Firefly in hopes that its value would increase before sale. So we'll consider his holding the Firefly and showing it at exhibitions as a single activity under section 183 because of their nearly inextricable "organizational and economic interrelationship." Sec. 1.183-1(d)(1), Income Tax Regs.

We can infer a profit motive here only if Kurdziel expected that the Firefly's appreciation would exceed its operating expenses, such that the eventual gain on sale would allow him to recoup his losses. See Bronson v. Commissioner, T.C. Memo. 2012-17, 2012 WL 129803, at *8, aff'd, 591 F. App'x 625 (9th Cir.

[*27] 2015); sec. 1.183-2(b)(4), Income Tax Regs. At trial the lowest values presented by Kurdziel's experts were $3.5 million and $8 million, respectively, provided that the Firefly was kept "in excellent flying condition." Both experts also believed that vintage aircrafts were only increasing in value. One even sold a Firefly in prerestoration condition for nearly $400,000 in 2013 and testified that it would take $4 to $5 million more to get it in the condition of Kurdziel's Firefly. And while one expert didn't think Kurdziel's use of "replacement parts" to repair the Firefly after its 2012 crash would materially affect its value, both experts testified that planes deteriorate and lose value rapidly if they are not flown regularly.

The Commissioner emphasized that the Firefly became unairworthy in 2012 after its crash and remained grounded at the time of trial. That means that the Firefly was grounded for roughly four years, during which time its value probably decreased significantly. During the years at issue, however, the Firefly had not yet crashed and was airworthy, likely placing it within the experts' $3.5 to $8 million ballpark. So while Kurdziel did not have the Firefly appraised during this time, we think he was aware of its increasing value because of his exposure to experts in the vintage-warcraft field and the nearly $1.9 million he put into its restoration.

**[*28]** We therefore find that he had an expectation that he would cover his accumulated losses if he sold the Firefly.

This factor favors Kurdziel.

### J. Conclusion

Even having concluded that Kurdziel expected the Firefly to appreciate, what ultimately matters is whether he had a good-faith plan to realize a profit from its sale. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967). We aren't convinced that he did. The regulations tell us that no one factor is more important than another. See sec. 1.183-2(b), Income Tax Regs. The expectation that the Firefly will appreciate in value is important here because a sale is the only true way Kurdziel could turn a profit. But this doesn't make the other factors less weighty, since together they signal whether he ever intended in good faith to make a profit. And appreciation does little to help Kurdziel's case if we find that his work on the Firefly was personal. See Barter v. Commissioner, T.C. Memo. 1991-124, aff'd without published opinion, 980 F.2d 736 (9th Cir. 1992).

Kurdziel's argument that he intended to hold the Firefly for investment all along is contrary to much of the evidence. His business plan was unclear from the start: Was he leasing the airplane, selling rides on it, or entering it in airshows to

[*29] promote it? Even more troubling is that Kurdziel chose to list his Firefly activities as "airplane leasing" when he never once leased the Firefly out, and was aware that he couldn't legally sell rides on it. This knowledge also colors our view of his early business plans. We therefore do not find his updated plans to hold the Firefly for an investment to be credible. What's more, we find it hard to believe that Kurdziel intended to sell the Firefly all along when he didn't have a formal appraisal--if we can call it that--done before 2014, and admitted on his California property tax documents that he was not holding it for sale or for profit.

Even for a court like the Seventh Circuit that doesn't slavishly follow the regulation's factors, see Roberts, 820 F.3d at 250, 254, a "holistic" approach would land in the same place. Given the risks that Kurdziel admitted are associated with flying the Firefly, we find it suspect that he didn't try to sell it. We can reasonably see him holding the Firefly for a few years after restoration to enter airshows and increase exposure. But Kurdziel didn't seem to even think of selling it in the years before us, and affirmatively represented to local tax authorities that he didn't intend to do so.

He instead continued to hold the plane for nearly 15 years after its restoration was complete and it was awarded grand champion titles--a time when it was arguably at its most valuable--all while using the considerable expenses of its

[*30] upkeep to offset his significant other income. As a result, a "holistic" analysis would reach the same result as the application of the nonexclusive list of factors test--the conclusion that it is more likely than not that Kurdziel did not engage in his Firefly-related activities for profit within the meaning of section 183. He is therefore not entitled to deduct his expenses in excess of gross income from the activity.

II.    Substantiation

Whether the Firefly restoration and maintenance was a profit-seeking activity is the big issue, but the parties also dispute whether Kurdziel substantiated certain deductions. These disputed deductions include Kurdziel's 2010 "annual inspection" expenses listed on his Schedule C and several Schedule A deductions.

A.    2010 Schedule C Annual Inspection Expenses

As an alternative to his not-for-profit activity argument, the Commissioner allowed Kurdziel to deduct $6,488 in "annual inspection" expenses for 2010 but disallowed the rest, arguing that they lack a business purpose. The disallowed expenses include a $1,000 cash withdrawal that Kurdziel claims he paid to a friend, Tom Haug, relating to the Firefly's 2010 annual inspection, as well as some meal and other expenses. The Commissioner says that Kurdziel failed to explain Haug's relation to the inspection and failed to introduce evidence that any such

[*31] payment was actually made. He also says that the meals were not limited to 50% of their cost, see sec. 274(n), and points to section 262 to disallow the other expenses as personal.

We can break off this attack with the observation that Kurdziel reported zero gross income from his Firefly-related activities for 2010, and therefore can't claim any related deductions. See sec. 183(b)(2) (limiting deductions from gross income where the deductions arise from an activity not engaged in for profit); see also Kinney v. Commissioner, T.C. Memo. 2008-287, 2008 WL 5330815, at *7 ("Given the section 183(b)(2) limitation, we do not need to address whether petitioners substantiated other deductions").

### B.   2010 Schedule A Deductions

The deductions in dispute on Kurdziel's 2010 Schedule A are for unreimbursed employee business expenses relating to his employment as an airline pilot--the costs of Kurdziel's travel, personal vehicle, and parking--home mortgage interest, real estate taxes, and tax preparation fees.

**[*32]**       1.       <u>Employee Business Expenses</u>

These expenses are for meals and travel and total nearly $19,000.[4]  Section 162(a) allows a deduction for all ordinary and necessary business expenses.  Section 274(d) tacks more stringent substantiation requirements onto section 162 in cases where the line between personal and business expenses is blurred.  This higher hurdle affects expenses for entertainment, meals, and lodging.  Secs. 274(d)(1), 280F(d)(4); sec. 1.274-2(b)(1), Income Tax Regs.  And when such expenses are at issue, taxpayers must present adequate records sufficient to establish (1) the amount of the expense, (2) the time and place of the expense, (3) the business purpose of the expenditure, and (4) the business relationship to the taxpayer of each expenditure.  Sec. 274(d) (flush language); sec. 1.274-5T(b)(3), (6), Temporary Income Tax Regs., 50 Fed. Reg. 46015, 46016 (Nov. 6, 1985).

Adequate records may come in the form of an account book, a diary, a log, a statement of expenses, trip sheets, etc.--basically any documentary evidence sufficient to establish each element of an expenditure or use.  <u>See</u> sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

---

[4] On his 2010 Schedule A, Kurdziel claimed a $30,822 unreimbursed employee business expense deduction, of which the Commissioner allowed $11,869 for meal and entertainment expenses.

**[*33]** But section 274 bars us from estimating such expenses. Id. para. (a)(4), 50 Fed. Reg. 46014.

The Commissioner argues that Kurdziel's claimed vehicle, parking, and travel expenses--for trips made from his home in San Diego to Delta's flight hub in Detroit--are nondeductible because they were commuting expenses. He also argues that Kurdziel's vehicle expenses fail to comply with section 274(d)'s strict substantiation requirements. Kurdziel argues that the Commissioner conceded this issue. But what the Commissioner conceded was only some of these expenses. See supra note 4. Kurdziel did offer a list of these expenses, but they only bolster the Commissioner's argument that he was trying to deduct commuting expenses.

The Supreme Court has explained that such expenses are not deductible because the taxpayer makes a personal decision as to where he lives. See Commissioner v. Flowers, 326 U.S. 465, 473-74 (1946). In Flowers, the taxpayer was a resident of Jackson, Mississippi who decided to continue to live in Jackson after he accepted a job in Mobile, Alabama. Id. The taxpayer was not allowed to deduct the costs of his travel despite the distance, because the costs were personal. Id. There are three exceptions to this general rule of nonduductibility: (1) if the residence is a taxpayer's principal place of business and he travels to another place of business, (2) if the taxpayer has one or more regular work

[*34] locations away from his residence, and (3) if a taxpayer travels to a temporary work location.  See Bogue v. Commissioner, T.C. Memo. 2011-164, 2011 WL 2709818, at *6, aff'd, 522 F. App'x 169 (3d Cir. 2013).

We find that none of these exceptions applies.  Detroit is Kurdziel's permanent work base--there is nothing temporary about it--and Kurdziel has chosen to live in San Diego.  There are, however, a handful of charges on Kurdziel's list that are for travel to different locations:  Minneapolis, Ontario, Los Angeles, Miramar, and Reno.  The second exception, for travel to more then one "regular work locations," allows a deduction for a taxpayer who has one or more regular work locations.  See Rev. Rul. 99-7, 1999-1 C.B. 361.  Kurdziel, however, spent only one or two nights in cities other than Detroit, and we don't find that "regular" enough to fall within this exception.

The last exception allows a deduction for "daily transportation expenses incurred in going between the taxpayer's residence and a temporary work location outside the metropolitan area where the taxpayer lives and normally works."  Id. Even if we think this exception could apply, we have no way of knowing whether Kurdziel traveled directly from his residence in San Diego to one of the non-Detroit locations based on the list of expenses he's produced.  The Commissioner is correct that the list by itself is unreliable, and Kurdziel even admitted that it

[*35] included some personal expenses. This is not enough. We agree with the Commissioner's disallowance.

2. Home Mortgage Interest, Real Estate Taxes, and Tax Preparation Fees

There are three other disputed deductions: home-mortgage interest, real-estate taxes, and tax-preparation fees. The Commissioner argues, "it is not contested that petitioner failed to substantiate his claimed real estate taxes deduction, home mortgage interest deduction, and tax preparation fee deduction."

*Home mortgage and real-estate tax:* The Code generally allows a deduction for all interest paid or accrued within the taxable year on a qualified residence. See sec. 163(a), (h)(2)(D). On Kurdziel's 2010 return he claimed a home-mortgage interest deduction of $64,688. Only $1,725 of that amount remains in dispute. Kurdziel also claimed a real-estate tax deduction of $9,411, which the Commissioner allowed to the extent of $7,500. This means $1,911 is still in dispute.

The Commissioner says that Kurdziel failed to substantiate these deductions--and that is about all he says. There's nothing else in his answer, amended answer, or pretrial memorandum, and he barely addressed them in his posttrial brief. Kurdziel didn't add much more: When we asked his attorney

**[\*36]** about the home-mortgage interest deduction at trial, he replied, "I don't think we addressed that."

When there's nothing in the record, defeat comes for the party with the burden of proof. See sec. 7491(a). That's Kurdziel, so we find for the Commissioner on these disputed amounts.

*Tax-preparation fees:* A taxpayer may deduct the cost of preparing his tax returns. See sec. 1.212-1(l), Income Tax Regs. Kurdziel claimed this expense was $800 on Schedule A of his 2010 return. Kurdziel said at trial that his proof would be in evidence, but all we can find is a June 2010 bank statement that shows a check for $800. We have nothing beyond that to show this payment was for tax preparation, and Kurdziel's testimony was likewise unhelpful. We also disallow this deduction.

## III. Net Operating Losses

The final disputed deductions are the NOLs that Kurdziel carried forward to his 2007-10 tax returns.

NOLs are the excess of deductions allowed over gross income, and are permitted by section 172(a). Both parties agree that the deductibility of Kurdziel's NOLs hinges on our finding he had a profit motive for his Firefly activities. Since we found that Kurdziel did not, we deny his NOL deductions for all years at issue.

[*37] IV.　　Section 6662(a) Penalties

The Commissioner determined section 6662(a) penalties against Kurdziel for 2007, 2008, 2009, and 2010.  Section 6662 imposes a 20% penalty on underpayments of tax due to either a substantial understatement, see sec. 6662(b)(2), (d), or negligence or disregard of the rules or regulations, see sec. 6662(b)(1), (c).  And when a taxpayer is an individual, the Commissioner has the initial burden of production for penalties.  See sec. 7491(c).

The Commissioner argues that Kurdziel is subject to a substantial-understatement penalty only for the 2007 and 2010 tax years.  He meets part of his burden for these years because Kurdziel's understatements are both more than $5,000 and more than 10% of the tax he should've reported for each of these years.  See sec. 6662(d)(1)(A).

The Commissioner also argues that Kurdziel is subject to a negligence penalty, but this time for each of the years at issue.  He meets part of his burden to establish negligence because he showed that Kurdziel "fail[ed] to make a reasonable attempt to comply with the provisions of the internal revenue laws," sec. 1.6662-3(b)(1), Income Tax Regs., by misrepresenting his not-for-profit activities as an "airplane leasing" business.  This reporting position allowed

[*38] Kurdziel to achieve large, income-offsetting deductions that were "too good to be true." Id. subdiv. (ii).

Kurdziel argues that he doesn't owe penalties for any of the years at issue because his losses are "real" and he acted with reasonable cause and in good faith by reporting his Firefly activities on his Schedules C in accordance with the plane's ownership and operation. See sec. 6664(c)(1); see also sec. 1.6664-4(b)(1), Income Tax Regs. He says that he listed the activities as "airplane leasing" since the Firefly is owned by a trust, which in turn leases it out to the Firefly LLC. This may make sense on some level, but the fact is that this representation is misleading, especially given that Schedule C's Line A asks for the "[p]rincipal business or profession, including product or service (see instructions)."[5] If Kurdziel wasn't sure what to put in order to show that he was really only holding the Firefly for appreciation, there were numerous ways he could have made this more clear, e.g., attaching a supporting statement or even just listing "holding airplane as investment." Kurdziel's reporting position only reinforces our finding that he didn't have a profit motive. We therefore don't believe he has shown good faith or reasonable cause.

---

[5] The 2010 instructions for Schedule C specify: "Describe the business or professional activity that provided your principal source of income * * * . Give the general field or activity and the type of product or service."

**[\*39]** But the Commissioner committed a <u>Graev</u> error. Part of the Commissioner's burden of production on the penalties at issue here is showing that they were "personally approved (in writing) by the immediate supervisor of the individual making such determination." Sec. 6751(b)(1); <u>see</u> <u>Graev III</u>, 149 T.C. at 493; <u>see also</u> <u>Ford v. Commissioner</u>, T.C. Memo. 2018-8, at \*6, <u>aff'd</u>, 751 F. App'x 843 (6th Cir. 2018). He didn't introduce any evidence of such approval at trial despite the fact that Kurdziel placed penalties at issue. Thus, the Commissioner did not meet his burden of production, and Kurdziel is for this reason alone not liable for the accuracy-related penalties determined against him for 2007-10.

With no outright victor,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.